Case No. 24-2024

_____

# United States Court of Appeals
## for the Sixth Circuit

_____

**JULIE A. SU, Acting Secretary of
the United States Department of Labor,**

*Petitioner-Appellee,*

v.

**FORGE INDUSTRIAL STAFFING, INC.,**

*Respondent-Appellant,*

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Paul L. Maloney
Case No. 1:23-mc-00066

_____

**APPELLANT'S EMERGENCY MOTION FOR (1) AN IMMEDIATE
ADMINISTRATIVE STAY AND (2) A STAY PENDING APPEAL**

_____

Brion B. Doyle (P67870)
Neil Youngdahl (P82452)
Varnum LLP
P.O. Box 352
Grand Rapids, Michigan 49501-0352
(616) 336-6000
bbdoyle@varnumlaw.com
neyoungdahl@varnumlaw.com

*Attorneys for Respondent-Appellant*

## RELIEF REQUESTED

The District Court ordered Respondent-Appellant Forge Industrial Staffing, Inc., to produce sensitive business records to the Department of Labor ("DOL") **on or before December 10, 2024**.  Forge has exercised its right to appeal that Order to this Court.  As explained in detail below, the turnover of these documents on December 10, 2024 would not only moot the appeal to which Forge is entitled, it would threaten Forge's very existence.  Given these immediate harms, Forge seeks a stay pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2).[1]

Moreover, the December 10, 2024 deadline is approaching.  **Accordingly, Forge requests that, upon receipt of this Motion, the Court immediately enter an administrative stay of the District Court's Order and Judgment.**  *See United States v. Texas*, 144 S. Ct. 797 (2024) (administrative stays "freeze legal proceedings until the court can rule on a party's request for expedited relief . . . an administrative stay buys the court time to deliberate.").

---

[1] Forge has satisfied the procedural requirements for seeking a stay in this Court.  First, Forge requested a stay as part of its Objections to the Magistrate Judge's Report and Recommendation.  (ECF No. 25, PageID.240-243).  The District Court rejected this request as part of its Order partially adopting the Report and Recommendation.  (ECF No. 29, PageID.283-284).  Forge's request amounted to a *de facto* motion under Federal Rule of Appellate Procedure 8(a)(1).  Second, on November 25, 2024, Forge's counsel informed the DOL's counsel that Forge would be filing this Motion.  See Fed. R. App. P. 8(a)(C).  DOL's counsel declined to concur in the relief sought.

i

Although this Court has "not adopted a standard for when an administrative stay is appropriate" it recognizes that "the touchstone of this analysis is whether an administrative stay is needed to preserve the status quo." *United States v. Eaton Corp.*, Case No 24-3732, 2024 WL 4513277, at *1 (6th Cir. Sept. 3, 2024) (granting an administrative stay of an order requiring compliance with an IRS subpoena) (internal quotation marks and citations omitted). That standard is surely met here: the District Court's 21-day deadline virtually guaranteed that this motion would not be decided until after Forge's deadline passed. Not only will an administrative stay allow the Court to decide this Motion with a complete briefing and time for deliberation but, absent an administrative stay, Forge will be deprived of any appellate review of the District Court's Order. This is why administrative stays are particularly appropriate in government-subpoena cases. *See Eaton Corp.*, 2024 WL 4513277, at *1; *Bragg v. Pomerantz*, Case No. 23-615-L, 23-616-con, 2023 WL 3015207, at *1 (2d Cir. April 19, 2023) (granting an administrative stay related to a government subpoena). The Court should enter an administrative stay pending its decision on Forge's Motion for a stay pending appeal.

## I.    <u>INTRODUCTION</u>

On February 25, 2023, the New York Times published an article on nationwide child-labor violations, which it claimed was the result of a 20-state investigation involving interviews with over 100 migrant child workers.[2]  This article embarrassed the DOL, which is charged with enforcing child-labor laws.  So, the DOL began a wide-ranging, amorphous investigation of every company connected to the article, including Forge, a temporary-staffing agency which worked with some employers mentioned in the article.

As part of its years-long investigation of Forge—which has resulted in no *allegations* of labor law violations, let alone any findings—the DOL issued two administrative subpoenas.  In response, Forge produced over 60,000 pages of documents, fully responding to 24 of the 26 categories of documents that the DOL requested.  Unsatisfied, the DOL focused on the one aspect that Forge resisted: the DOL's request for a list of Forge's clients.  Forge has not provided those lists due to its legitimate—and now proven—fear that government officials knocking on its client's doors in connection with a baseless child-labor investigation will further harm Forge's business, which is already down 40% since the New York Times published its article.  Despite negotiating and reaching a reasonable pre-litigation

---

[2] *See* https://www.nytimes.com/2023/02/25/us/unaccompanied-migrant-child-workers exploitation.html.

resolution of the DOL's request, the DOL abruptly changed its mind and initiated this proceeding to enforce the one small category of the subpoenas that Forge resisted.

The District Court ordered Forge to comply with the subpoenas. That decision was erroneous, as Forge will fully explain in its forthcoming merits brief. But the more immediate concern is that the District Court's Order requires production of the documents **on December 10, 2024**. If Forge is required to comply with this Order, it will not only lose its right to appellate review but will face the prospect of financial ruin. Given the substantial chance that Forge will succeed on appeal, this harm justifies a stay of the District Court's Order and Judgment pending appeal.

## II.    **BACKGROUND**

Forge is a temporary-staffing agency, connecting businesses and workers for temporary or contract work. (Declaration of Brian Oele, ECF No. 15-1, PageID.103). Employers like Forge must deal with the reality that underage workers sometimes provide false information and present falsified documents in an effort to gain employment, and that these tactics are growing more sophisticated. Accordingly, Forge invests significant time and effort to avoid inadvertently employing underage workers. (*Id*. at PageID.103-104). Before this suit, Forge had never even been accused of a child-labor law violation, (*Id*. at PageID.103), and for

good reason: under no circumstances would Forge ever knowingly place a child under the age of 18 with one of its clients. (*Id*.).

Forge has multiple safeguards in place in its application, interview, and onboarding processes to confirm that applicants are at least 18 years old. (*Id.* at PageID.104). Forge's staff is continuously trained regarding Forge's policies and identity verification practices, and staff members are periodically tested, including by "mystery shoppers," paid "applicants" who intentionally attempt to get hired while being out of compliance with Forge policies. (*Id*.). Forge also periodically engages outside counsel to audit its policies and procedures. (*Id.*).

Despite these safeguards, Forge is not immune to accusations. On February 25, 2023, the New York Times published an article on nationwide child-labor violations. The article references three underage workers who allegedly worked at one of Forge's clients, Hearthside Food Solutions ("Hearthside") in the prior year. There are no statements or assertions in the article that Forge knowingly placed minors at Hearthside or that Forge otherwise violated any laws. In response to the article, Forge retained outside counsel and immediately undertook an extensive internal investigation to determine whether any of its supervisors or administrative staff were either intentionally placing minors with clients or otherwise failing to comply with company policies. (*Id*. at PageID.104). Forge found no evidence that either of those issues were occurring. (*Id.*).

Forge was investigated by multiple state and federal agencies in the aftermath of the article. (*Id*. at PageID.105-106). With the sole exception of the client information at issue in this case, Forge has fully responded to every request for information from every agency and has not had any disputes with any other agency. (*Id*. at PageID.106).

Forge first received contact from the Michigan Department of Labor and Economic Opportunity ("LEO"). (*Id*. at PageID.105-106). Forge produced voluminous information to the LEO, including a list of current and former employees who were employed with Forge and placed at Hearthside for the period of February 27, 2022, to present. (*Id*.). Forge also received Notices of Inspection from the U.S. Department of Homeland Security, related to Forge's Grand Rapids offices. (*Id*. at PageID.106). Forge fully complied with all of these requests, which again included a voluminous production of information and documents related to current and former workers. (*Id*.).

In addition, Forge also received subpoena requests from the DOL, which were much broader than the requests from the other agencies. (Subpoenas, ECF No. 15-2). The twenty-six categories of requested information included expansive requests for general corporate information and information related to <u>all current and former workers at every Forge location in Michigan and Indiana for the past three years</u>. Except for the client information at issue in this case, Forge produced all

4

responsive information. (Oele Decl., ECF No. 15-1, PageID.106). Specifically, Forge made two separate productions to the DOL, in March and May 2023, which together involved over 60,000 pages of material and the production of native spreadsheets with tens of thousands of lines of information related to Forge's workers.

The DOL has never taken issue with the thoroughness of Forge's response to the 24 categories of documents to which Forge did not object. Even the District Court acknowledged that "Forge has largely complied with the DOL's investigation." (Order, ECF No. 29, PageID.285). From the very beginning of the DOL's investigation, however, Forge has asserted its belief that producing client information would cause significant, and perhaps fatal, damage to the company. (Declaration of Brion Doyle, ECF No. 15-3, PageID.121). All of Forge's client contracts are terminable at will upon a short period of notice, and Forge has multiple competitors in each market it serves. (Oele Decl., ECF No. 15-1, PageID.106). Thus, all of Forge's clients have the right to terminate their contracts with Forge, with ready access to many other staffing agencies. (*Id.*).

In Forge's business, the stigma of being (falsely) associated with child labor cannot be overstated. Forge has already experienced devastating losses related to the article, having lost 17 clients, representing approximately $9.5 million in annual revenue, with multiple clients indicating that they were terminating or scaling back

business in direct response to the article. (*Id.*). Forge also lost eight potential clients who either intimated that they could no longer move forward with Forge due to the article and investigation or simply broke off contact at that time. (*Id.* at PageID.107). These losses have resulted in layoffs at Forge, and Forge's overall revenue with its existing clients is down approximately 40%, much more so than industry trends would dictate. (*Id.*).

The harm that Forge seeks to avoid has played out in real time. Just a few weeks ago, Hearthside filed for bankruptcy, a filing that has been directly linked to the fallout resulting from the New York Times's accusations of using child labor. Dietrich Knauth, REUTERS, *Snack maker Hearthside files for bankruptcy after child labor probe* (November 22, 2024) (available at https://www.reuters.com/business/retail-consumer/snack-maker-hearthside-files-bankruptcy-after-child-labor-probe-2024-11-22/); Talia Soglin, CHICAGO TRIBUNE, *Downers Grove-Based Hearthside, under investigation for alleged child labor*, files for bankruptcy (November 25, 2025) (available at https://www.chicagotribune.com/2024/11/25/downers-grove-based-hearthside-alleged-child-labor-files-for-bankruptcy/). Forge's fear is that, if federal agents appear at its clients' locations and begin talking about child labor in the same breath as Forge, the clients will terminate their at-will contracts, turn to a competitor, and ultimately doom Forge to Hearthside's fate.

Forge has already suffered devastating harm, and additional client losses will put the company out of business. For these reasons, <u>Forge has worked extensively to reach a compromise with the DOL on the issue at the center of this litigation</u>. For months before this litigation was initiated, counsel for Forge engaged in discussions and proposed that Forge make any workers available for interviews at Forge's offices. (Doyle Decl., ECF No. 15-3, PageID.121). While the DOL was ostensibly considering that offer, they filed this proceeding, to Forge's surprise and disappointment. (*Id*. at PageID.121-122). Forge's counsel immediately contacted the DOL's attorney, picking up the conversation about a resolution from where it had been dropped. (*Id*.).

Specifically, counsel for Forge proposed an alternative approach where Forge would provide its workers for interviews at Forge's offices. (*Id*. at PageID.122). As Forge's counsel explained, if DOL personnel show up on job sites, they have no guarantee that any workers will talk to investigators. (*Id*.). In contrast, Forge indicated that it was willing to pay workers and encourage and coordinate their participation, guaranteeing a much higher likelihood of participation. (*Id*.). Forge's counsel also indicated that the DOL should select the workers it wanted to interview and would have unfettered access to workers at Forge's offices. (*Id.*).

The DOL agreed to Forge's proposal, and, on August 8, 2023, the parties notified the District Court of their agreement on a proposed interim measure. (Joint

7

Motion to Adjourn, ECF No. 9, PageID.70). On September 19, 2023, the DOL provided Forge with its initial list of requested employees for interviews. Forge immediately coordinated the interviews, informing the selected employees that they should participate, should speak freely, would face no adverse employment consequences, and would be paid double time for participating. (Oele Decl., ECF No. 15-1, PageID.107-108). The DOL conducted the first round of interviews on September 28, 2023. (*Id*. at PageID. 108).

On October 5, 2023, counsel for the DOL contacted counsel for Forge with a proposal to resolve this matter, indicating that the DOL "would be willing to resolve the subpoena enforcement action/forego the contractor information" if Forge agreed to produce a package of employment documents for each employee, relinquishing its request for the client information. (October 5, 2023 E-mail, ECF No. 15-5) (emphasis added). However, even as Forge was preparing materials to respond to this request and resolve this matter, counsel for the DOL wrote six days later to indicate that the DOL was no longer willing to consider *its own offer* to resolve the subpoena dispute. (October 11, 2023 E-mail, ECF No. 15-6). Forge's counsel sought an explanation for this abrupt change, and none was given, other than vague references to the political nature of child-labor issues.

On the merits, Forge objected to the DOL's subpoenas because they were not "sufficiently narrowly tailored" and because the DOL had not taken "efforts to

confine the scope" of its requests to that which is necessary to its investigation. *See Doe v. United States*, 253 F.3d 256, 271 (6th Cir. 2001). Forge also argued that the Court should account for the potentially business-ruining effects of producing Forge's client lists. *Id*. at 267 ("[T]he court should weigh the likely relevance of the requested material to the investigation against the burden of producing the material."). At bottom, Forge argued that the subpoenas were unreasonable. *Id*. at 263. ("[T]he agency request must be reasonable.").

Magistrate Judge Phillip J. Green issued a Report and Recommendation ("R&R") on the DOL's Petition, recommending that the Court enforce the subpoenas and order Forge to pay the DOL's attorney fees. (ECF No. 22). Forge filed Objections. (ECF No. 25). After the Supreme Court issued its decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), both sides filed supplemental briefs on the impact that the demise of judicial deference to agency action had on this case. (ECF Nos. 27 and 28). On November 19, 2024, the District Court overruled Forge's Objections and adopted the R&R in full, except for the R&R's recommendation that Forge pay attorney fees. (ECF No. 29). Under the Court's Order, Forge has until December 10, 2024 to turn over the client lists.

## III.  <u>ARGUMENT</u>

To decide whether to stay a case pending appeal, this Court considers "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2)

the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). These "factors are not prerequisites but are interconnected considerations that must be balanced together." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (citation omitted).

The interrelatedness of the first two factors is particularly important because "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay*." A. Philip Randolph Institute v. Husted*, 907 F.3d 913, 919 (6th Cir. 2018) (quoting *Mich. Coalition*, 945 F.2d at 153-54). Put differently, "more of one excuses less of the other." *Id.* If a stay applicant faces a sufficient threat of irreparable harm, it "need not . . . establish a high probability of success on the merits." *Husted*, 908 F.3d at 918. Instead, it need only show "serious questions going to the merits." *Id.*

## A. ABSENT A STAY, FORGE WILL SUFFER IRREPARABLE HARM.

If the Court does not stay the December 10 deadline, Forge will suffer at least two irreparable harms. First, Forge will lose its right to appeal the District Court's Order. This Court has squarely held that Forge has the right to appeal the District Court's decision to enforce the subpoenas. *See Doe*, 253 F.3d at 261 ("In the case of administrative subpoenas, parties may immediately appeal district court orders

enforcing these subpoenas[.]"); *see also Gelboim v. Bank of America Corp*., 574 U.S. 405, 407 (2015) ("An unsuccessful litigant in a federal district court may take an appeal, as a matter of right, from a final decision of the district court.") (internal quotations and brackets omitted). However, if the District Court's Order is not stayed, Forge will be compelled to produce the client lists while the appeal is pending, thereby mooting the central issue in this case—whether Forge has to turn over the client lists at all. "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *McPherson v Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc). Here, Forge will be asking this Court to reverse the District Court's ordering compelling it to turn over the client lists; if, in the interim, the District Court is allowed to compel Forge to turn over the client lists, this Court will be unable to grant Forge's requested relief.

Depriving Forge of its appellate rights is a "quintessential form of prejudice[.]" *In re Country Squire Assoc. of Carle Place, L.P.,* 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (granting a stay pending appeal based on the harm of a loss of appellate rights); *see also Zagorski v. Mays*, 906 F.3d 414, 416 (6th Cir. 2018) ("If we do not grant a stay, we will necessarily be deciding or rendering moot his appeal, without affording Zagorski the opportunity to present his appeal to us in the first instance."). And, once gone, no amount of money could restore Forge's appellate

rights. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (a harm is irreparable if it is "not fully compensable by money damages" because "the nature of the plaintiff's loss would make damages difficult to calculate.").

Thus, Forge will surely suffer irreparable harm in the form of lost appellate rights if the Court does not enter a stay.[3] *See also, e.g., Ctr. For Int'l Env't L. v. Off. of U.S. Trade Representative*, 240 F. Supp.2d 21, 23 (D.D.C. 2003) ("[T]he irreparable harm to defendants lies in the fact that '[o]nce the documents are surrendered pursuant to the lower court's order, confidentiality will be lost for all time. The status quo could never be restored . . . Failure to grant a stay will entirely destroy appellants' rights to secure meaningful review.' This strong showing of irreparable harm—de facto deprivation of the basic right to appeal—further strengthens defendant's argument for a stay pending appeal.") (quoting *Providence Journal Co. v. FBI*, 595 F.2d 889 (1st Cir. 1979)); *First City, Texas-Houston, N.A. v. Rafidain Bank*, 131 F. Supp.2d 540, 543 (S.D.N.Y. 2001) ("The Court further concludes that Rafidain will suffer irreparable harm unless a stay is granted, since . . . it will then be obligated, in order to purge its contempt, to provide the very discovery it argues it has no obligation to produce.); *EEOC v. Quad/Graphics, Inc.*,

---

[3] The District Court did not mention this inevitable irreparable harm in its decision to not enter a stay, despite the fact that Forge raised it in its Objections. (ECF No. 29, PageID.284; ECF No. 25, PageID.242).

875 F. Supp. 558, 560 (E.D. Wis. 1995) ("I believe that Quad/Graphics would be irreparably harmed if the court's order is not stayed, as its appeal would effectively be rendered moot in the absence of a stay. Requiring the respondent to turn over the requested information, where its appeal is seeking to avoid such requirement, would make the appeal academic."); *NLRB v. Gen. Motors Corp.*, 510 F. Supp. 341, 342 (S.D. Ohio 1980) ("There is no question that the respondents will suffer irreparable harm if this stay is denied. If they obey the subpoenas, their appeal is mooted; if they ignore them, they could be held in contempt of court."); *EEOC v. FedEx Corp.*, No. 06-276-TUC-RCC, 2007 WL 9734298, at *2 (D. Ariz. Oct. 5, 2007) ("FedEx will suffer irreparable harm if a stay is not issued. If a stay is not issued FedEx's appeal will become moot and Fed Ex will be required to disclose confidential information.")

The second irreparable harm that Forge faces is existential. Once armed with client lists, the DOL will appear on the doorsteps of Forge's clients, baselessly associating Forge with its investigation into child labor. Forge's clients, who have at-will contracts and plenty of options for their staffing needs, will then terminate their contracts with Forge. (Oele Decl., ECF No. 15-1, PageID.106). This fear is not speculative: Forge has lost clients, prospects, and 40% of its revenue since it was mentioned in the New York Times Article. The DOL seeks to put the official stamp of the federal government on this story and then retell it specifically to Forge's

clients—even though its years-long investigation has produced *no* evidence of child-labor violations at Forge.

The District Court opined, without any basis, that "the damage has already been done." (Order, ECF No. 29, PageID.284). Similarly, the DOL has highlighted the news fallout of the New York Times article, implying that all reputational harm that could occur has occurred. This misses two important points: (1) the DOL's actions have weight that the New York Times's words do not; and (2) telling a story twice will have a greater effect than telling it once. Some Forge clients will have dismissed the New York Times article but will reconsider when DOL agents knock on their door, looking to connect Forge to child labor. This will inevitably result in further business loss to Forge, which is still reeling from the article itself. Thus, while it is true that Forge has already suffered one round of business losses, the point of this Motion is to avoid a *second* round that could put it out of business before the Court can consider this appeal. And this threat is not hypothetical: mere weeks ago, Hearthside declared bankruptcy, partially due to the economic fallout of being connected to a child labor investigation.

An "impending loss or financial ruin of [movant's] business constitutes irreparable injury." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995).[4] Put differently, "irreparable injury has been

_____

[4] To be clear, this Court distinguishes between loss-of-enterprise harm and

characterized as loss of a movant's enterprise." *Id.* "[S]ubstantial loss of business is irreparable because, in addition to the obvious economic injury, loss of business renders a final judgment ineffective, depriving the movant of meaningful judicial review." *Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1307 (C.I.T. 2017) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (holding that a threat of "substantial loss of business and perhaps even bankruptcy" satisfied the irreparable-harm prong of injunctive relief)). Given the clear threat to Forge's existence that disclosure of the client lists presents, the irreparable-harm factor favors granting a stay.

### B. FORGE'S APPEAL WILL, AT A MINIMUM, RAISE SERIOUS QUESTIONS GOING TO THE MERITS OF THE DISTRICT COURT'S ORDER.

An administrative subpoena "is properly enforced if (1) it satisfies the terms of its authorizing statute, (2) the documents requested were relevant to the [agency]'s investigation, (3) the information sought is not already in the [agency]'s possession, and (4) enforcing the subpoena will not constitute an abuse of the court's process." *Doe v. United States*, 253 F.3d 256, 265 (6th Cir. 2001). Even if the agency satisfies its initial burden on the first three points, a subpoena will not be enforced if the party

---

financial harm. *Performance Unlimited*, 52 F.3d at 1382 (although there is a "general rule" that injunctive relief is inappropriate "where the potential harm to the movant is strictly financial . . . an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business.").

opposing enforcement "demonstrates that the subpoena is unreasonable, or issued in bad faith or for other improper purposes, or that compliance would be 'unnecessarily burdensome.'" *NLRB v. Am. Med. Response, Inc.*, 438 F.3d 188, 192–93 (2d Cir. 2006).

Although the Court generally reviews a district court's decision to enforce an administrative subpoena for an abuse of discretion, *EEOC v. Ferrellgas, L.P.*, 97 F.4th 338, 342 (6th Cir. 2024), any legal determination made by the District Court is reviewed de novo, *Doe*, 253 F.3d at 262.  Here, the District Court interpreted this Court's *Doe* decision as affirmatively prohibiting courts from considering "the potential economic fallout" of complying with the subpoena in their unduly-burdensome analysis.  (ECF No. 29, PageID.281).

That is not a proper reading of *Doe*.  As Forge explained in its Objections, although the Rule 26(b)(1) analysis contemplated by *Doe* may suffice for the average case, that does not mean that this is the *only* type of burden that can justify non-enforcement of an administrative subpoena.  *Doe* does not foreclose the possibility that other burdens can invalidate administrative subpoenas and reading it that way violates the "long held standard that questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon are not to be considered as having been so decided as to constitute precedents." *Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019).  Put simply, *Doe* holds that a Rule 26-

type burden is *a* type of burden that can invalidate an administrative subpoena; *Doe* does not hold that a Rule 26-type burden *is the only* type of burden that can invalidate an administrative subpoena.

A review of case law confirms that the qualifying undue burden is broader than the District Court's narrow view. Indeed, there is consensus among the courts of appeals that a subpoena is unduly burdensome if "producing the documents would seriously disrupt [respondent's] normal business operations." *See, e.g., F.T.C. v. Rockefeller*, 591 F.2d 182, 190 (2d Cir. 1979); *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 477 (4th Cir. 1986); *EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993) (compliance with an administrative subpoena should not be compelled if "compliance would unduly disrupt and seriously hinder normal operations of the business."); *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977) (an administrative subpoena should not be enforced if "compliance threatens to unduly disrupt or seriously hinder normal operations of a business."). By its plain language, this widely accepted principle is not cabined to administrative costs: the question is whether production of the documents **will seriously hinder respondents' operations**.[5] That test is met here: based on the undisputed evidence

---

[5] The District Court noted that there is a lack of specific case law to support of Forge's position. There is a simple explanation for that: "The easiest cases don't even arise." *United States v. Lanier*, 520 U.S. 259, 271 (1997). Just because prior administrations have not pressed companies to the point of bankruptcy with their

produced by Forge, production of these documents threatens to seriously disrupt Forge's normal business operations by further harming its remaining client relationships. In fact, a response could result in the ultimate hindrance: **Forge closing its doors altogether**. The District Court's failure to account for that burden was legal error, which this Court must correct on de novo review.

Moreover, judicial review of agency action is in the midst of a sea change. In *Loper Bright*, the Supreme Court confirmed that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" 144 S. Ct. at 2273. In fact, a court's duty to exercise its independent judgment is the reason that agencies cannot unilaterally enforce their own subpoenas. *See* 29 U.S.C. § 209 (incorporating 15 U.S.C. § 49). Congress requires a judge to sign off on an agency's subpoena and "[the] duty of independent judgment is perhaps 'the defining characteristi[c] of Article III judges.'" *Loper Bright*, 144 S. Ct. at 2283 (Gorsuch, J., concurring) (quoting *Stern v. Marshall*, 564 U.S. 462, 483 (2011)). Put simply, the Fair Labor Standard Act specifically places the judiciary between private citizens and government investigators so that the courts can protect those citizens from Executive Branch actors who try to impose ruinous, unnecessary, dragnet subpoenas. *See United States v. Markwood,* 48 F.3d 969, 979

---

subpoenas does not mean that the judiciary has to bless this practice.

(6th Cir. 1995) ("[A] district court is not a 'rubber stamp' for agency demands for the production of information.").

The Court's protective role is also apparent because dispositive questions in subpoena-enforcement proceedings—relevance, reasonability, and undue burden—"fall more naturally into a judge's bailiwick than an agency's." *Loper Bright*, 144 S. Ct. at 2267; *United States v. Gibbs*, 797 F.3d 416, 421 (6th Cir. 2015) (describing the court's "discretionary judgments" with respect to relevance and "probative value versus unfair prejudice"); *Potter v. Com'r of Soc. Sec.*, 9 F.4th 369, 379 (6th Cir. 2021) (describing how courts evaluate "objective reasonableness" on a case-by-case basis); *see also, e.g.,* Fed. R. Civ. 26(b)(1); Fed. R. Evid. 401, 403. *Loper Bright* makes clear that judicial deference to agencies on these legal questions or a limited role for the judiciary has no place in this statutory scheme.

As described in Forge's Objections, for the judiciary to bless an administrative subpoena, "the agency request must be reasonable." *Doe,* 253 F.3d at 263.  To date, no judicial officer has determined that the DOL's subpoenas are objectively reasonable.  Accordingly, the likelihood-of-success factor favors a stay so that this Court can decide these serious questions surrounding the law governing judicial review of administrative subpoenas.

### C.    THE OTHER FACTORS FAVOR GRANTING A STAY.

The Department will not be harmed by a stay. As the District Court recognized, "Forge has largely complied with the DOL's investigation," (ECF No. 29, PageID.285) and Forge has provided the vast majority of the information that the Department requested. The Department has been conducting its investigation of Forge for nearly two years at this point. There is no pressing need for this information that overrides Forge's imminent harm and the preservation of the judiciary's system of effective appellate review. And the public will be served both by the orderly process of the appellate system and non-enforcement of an improper exercise of government power. *See Klayman v. Porter*, 104 F.4th 298, 306 (D.C. Cir. 2024) ("It is well settled that a court may employ injunctive remedies to protect the integrity of the courts and the orderly and expeditious administration of justice.").

## IV.    CONCLUSION

For these reasons, Forge respectfully requests that the Court (1) immediately enter an administrative stay of the District Court's Order and Judgment pending its decision on this Motion to Stay Pending Appeal; and then (2) stay the District Court's Order and Judgment pending appeal.

Respectfully submitted,

VARNUM LLP
Attorneys for Defendants-Appellants

Date:  December 2, 2024          By: _/s/ Neil E. Youngdahl_____
                                        Brion B. Doyle (P67870)
                                        Neil Youngdahl (P82452)
                                        P.O. Box 352
                                        Grand Rapids, MI 49501-0352
                                        (616) 336-6000
                                        bbdoyle@varnumlaw.com
                                        neyoungdahl@varnumlaw.com

21

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(a) because this document contains 5,190 words.

2.      This document complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(D) because this document has been prepared in a proportionally spaced typeface using 14-point type.


Date: December 2, 2024                      */s/  Neil E. Youngdahl*
                                            Neil E. Youngdahl

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 2, 2024, I electronically filed this document with the Clerk of the Court using the ECF system, which will send notification of the filing to all ECF filing participants.


Date: December 2, 2024                    <u>        */s/  Neil E. Youngdahl*        </u>
                                                   Neil E. Youngdahl